KESSLER, P.J.
¶1 Danny L. Wilber appeals an order of the circuit court denying his postconviction motion for a new trial. Wilber raises several arguments on appeal. We affirm.
BACKGROUND
¶2 This case has a long and complicated history. On February 6, 2004, the State charged Wilber with the shooting death of David Diaz. According to the criminal complaint, on January 31, 2004, Milwaukee police were dispatched to a Milwaukee home to investigate a shooting. When police arrived, they found Diaz dead on the kitchen floor from a gunshot wound to the head. Police interviewed several witnesses, all of whom were at the home for a house party. Richard Torres and Jeranek Diaz both identified Wilber as the shooter. Torres and Jeranek said that Wilber acted belligerent at an after-hours party and attacked Jeranek. Torres, Jeranek, and another man, Isaiah, attempted to subdue Wilber and kick him out. At some point, Wilber pulled out a handgun and shot Diaz. Torres and Jeranek heard Wilber's sister, Antonia West, urge Wilber to leave, saying "Oh my God. You shot him. Get out of here. You shot him."[1]
Trial Testimony
¶3 The matter proceeded to trial where several witnesses testified. Milwaukee Police Officer Thomas Casper testified that he created a diagram of the crime scene showing the locations of all the physical evidence. Diaz's body was facedown in the kitchen with his head facing north. Bullet fragments were found behind the stove in the northeast corner of the kitchen. During the investigation, the eyewitnesses from the kitchen explained to detectives where everyone had been standing by placing "x's" with people's names or initials on diagrams of the kitchen.
¶4 Investigator William Kohl testified about the layout and dimensions of the kitchen. Kohl testified as to where the appliances were located, which portions of the kitchen were visible from different angles and from other parts of the house, and where Diaz's body was found in relation to the measurements of the kitchen.
¶5 Wilber's sister, Antonia, testified that she, Wilber, and other family members went to the house party in the early morning hours of the shooting following a night out at a local bar. Antonia denied saying "[y]ou shot him. Get out of here" to Wilber, but told the jury that she had to tell Wilber to "calm down" multiple times because Wilber "got into it" with another party-goer, Oscar Niles. Antonia also testified that Wilber grabbed and choked another man in the kitchen. Antonia said someone tried to grab Wilber from behind to stop the choking. Antonia was also in the kitchen at the time of the choking incident. She said the next thing she remembered was the sound of the gunshot coming from Wilber's direction.
¶6 Wilber's cousin, Donald Jennings, told the jury that he also attended the house party and was standing in the kitchen when Wilber got into an altercation with Niles. He testified that Wilber got aggressive with Niles and Jeranek intervened. Jennings said the parties "got to tussling and they grabbed each other. And that's when the shot was fired, hitting the man that was [found] laying on the ground." Jennings did not say that he saw Wilber shoot Diaz, but stated that he "yelled" at Antonia when they left the party because "she was saying, my brother, my brother, I can't believe this shit[.]" Jennings interpreted Antonia's statement to mean that Antonia saw her brother shoot Diaz.
¶7 Two other witnesses, Lea Franceschetti and Jaimie Williams, also testified that they heard Antonia say "I can't believe he did that," and "I can't believe he shot him." Franceschetti stated that she interpreted Antonia's statement to mean that Antonia knew the shooter.
¶8 Torres testified that he was also in the kitchen at the time Diaz was shot. He stated that immediately after the shooting he saw Wilber with a gun. Torres stated that Wilber, while in the kitchen, was acting aggressively towards other guests. Diaz, who was also in the kitchen, told Jeranek to ask Wilber to leave. Wilber "didn't want to hear that" and started choking Jeranek, who was standing next to Diaz. Torres intervened and got into his own altercation with Wilber. Wilber hit Torres, causing Torres to "black out a little bit" and "lean[ ] up against the ... sink." Torres said he then heard a gunshot from "the right side of my ... ear," where he said Wilber was standing. Torres said that he saw Wilber with a gun after the shooting "in a crouched position." Torres stated that he heard someone in the kitchen yell "you shot the guy," and then Wilber ran out. Torres stated that he tried to chase Wilber but lost him in the chaos.
¶9 Torres also testified that he saw a man named "Ricky" at the party with a gun, but that he did not see Ricky in the kitchen at the time of the shooting. Torres stated that there was no tension between Diaz and Ricky, but that the two exchanged "dirty looks" the week before. Torres stated that there did not appear to be tension between Diaz and Ricky at the party and that Torres was not concerned about Ricky's possession of a gun.
¶10 Jill Neubecker testified that she lived in the upper portion of a duplex above Wilber's sister, Wanda Tatum. She testified that police came to the house looking for Wilber on February 1, 2004. She told them that the night before, she smelled something on fire and saw smoke coming from an old grill in the back yard. Detective Joseph Erwin found the soles of a pair of shoes burnt in the grill.
¶11 The police officers who had interviewed Antonia, Williams, Niles, and Jeranek testified about statements they gave that were inconsistent with their trial testimony.
¶12 Mark Bernhagen, a shoe store manager, testified for the defense about shoe sizing. He testified that Wilber's feet were size fourteen and one-half. The soles of the burnt shoes found in the grill were size twelve, which were smaller than the shoes Wilber was wearing at trial.
Defense's Motion for an Adjournment
¶13 Shortly after the defense rested, defense counsel asked for an adjournment, telling the trial court that during the break, an eyewitness approached counsel and said that he saw "another person shooting the shot that struck the head of David Diaz." Counsel told the court that neither he nor Wilber was aware of the potential witness until that moment. The trial court allowed defense counsel to make an offer of proof.
¶14 Defense counsel called two of Wilber's sisters, Tatum and Monique West. Tatum told the court that six days after the trial began, Monique told Tatum "if my brother was found guilty this person was supposed to give a confession saying he did it." She stated that this information came from Monique's boyfriend, Roberto Gonzalez, who told Monique that if Wilber was convicted, another person would come forward and confess to the shooting. According to Tatum, Gonzalez told Monique that he and "Isaiah" were at the party the night of the shooting. Gonzalez told Monique that he heard Diaz tell his girlfriend to go get a gun, and in response, Isaiah pulled out a gun that went off and hit Diaz. Monique conveyed this information to Tatum. Tatum said she first learned that Gonzalez claimed to be at the house "a while ago," but she did not tell defense counsel because she did not "know that that was relevant."
¶15 Monique also testified, telling the trial court that her boyfriend, Gonzalez, told her that he witnessed Isaiah shoot Diaz. Monique stated that she told Tatum about Gonzalez's observation on the fourth day of trial, but could not explain why she did not tell counsel or anyone else. When asked whether she heard of the plan for someone else to confess if Wilber was convicted, Monique said she heard it from Tatum. The State asked, "So the notion or the idea or the fact that Isaiah's going to confess to this came from Wanda to Monique, not from Monique to Wanda?" Monique answered, "Right."
¶16 The trial court denied defense counsel's request to investigate the matter, stating that the sisters' testimony was inconsistent, lacked corroborating evidence, and was an "attempt to manipulate proceedings."
¶17 The jury found Wilber guilty of first-degree intentional homicide with the use of a dangerous weapon. The sentencing court sentenced Wilber to life in prison with the possibility of extended supervision after forty years.
Postconviction Motions
¶18 Wilber filed a postconviction motion for a new trial arguing that the trial court erroneously exercised its discretion in admitting evidence of the burned shoes and ordering Wilber to be restrained and in a wheelchair during closing arguments. The postconviction court denied the motion and this court affirmed. The Wisconsin Supreme Court denied Wilber's petition for review.
¶19 On March 17, 2014, Wilber, pro se , filed a WIS. STAT . § 974.06 (2015-16)[2] motion seeking physical and digital copies of the crime scene photographs the State used at trial. He also raised claims of newly discovered evidence and ineffective assistance of defense and postconviction counsel. The postconviction court denied the motion seeking photographs of the crime scene, but held its decision on the other issues pending further briefing.[3]
¶20 With the assistance of counsel, Wilber filed an amended postconviction motion arguing, as relevant here, that: (1) there was insufficient evidence to support his conviction; (2) trial counsel and postconviction counsel were both ineffective; (3) newly discovered evidence, in the form of statements from Jonathan Martin and Roberto Gonzalez, proves that Ricky Muniz admitted to murdering Diaz; and (4) he is entitled to a new trial in the interest of justice.
¶21 The postconviction court denied the motion. This appeal follows. Additional facts will be included as relevant to the discussion.
DISCUSSION
¶22 Whether a postconviction motion alleges facts which, if true, would entitle the defendant to relief is a question of law that we review de novo . See State v. Bentley , 201 Wis. 2d 303, 310, 548 N.W.2d 50 (1996). In order to obtain a hearing on a postconviction motion, a defendant must allege material facts sufficient to warrant the relief sought. State v. Allen , 2004 WI 106, ¶¶9, 36, 274 Wis. 2d 568, 682 N.W.2d 433. Non-conclusory allegations should present the "who, what, where, when, why, and how" with sufficient particularity for the postconviction court to meaningfully assess the claim. See id. , ¶23. No hearing is required when the defendant presents only conclusory allegations or when the record conclusively demonstrates that he or she is not entitled to relief. Nelson v. State , 54 Wis. 2d 489, 497-98, 195 N.W.2d 629 (1972). If the motion fails to allege sufficient facts, the postconviction court has the discretion to deny the postconviction motion without a hearing. See Bentley , 201 Wis. 2d at 310-11.
¶23 Wilber raises several issues on appeal. He argues that: (1) the postconviction court erroneously denied his newly discovered evidence claim; (2) the postconviction court erroneously denied his request for pictures of the crime scene; (3) trial counsel was ineffective for failing to investigate Gonzalez and for failing to retain relevant experts; (4) postconviction counsel was ineffective for failing to challenge the sufficiency of the evidence and for failing to raise trial counsel ineffectiveness; (5) this court erroneously denied his motion for remand; and (6) he is entitled to a new trial in the interest of justice. We address each issue.[4]
I. Newly Discovered Evidence
¶24 Wilber argues that the postconviction court erroneously rejected his claim that affidavits from Roberto Gonzalez and Jonathan Martin stating that Ricky Muniz shot Diaz constituted newly discovered evidence.
¶25 "Motions for a new trial based on newly discovered evidence are entertained with great caution." State v. Morse , 2005 WI App 223, ¶14, 287 Wis. 2d 369, 706 N.W.2d 152 (citation omitted). "The decision to grant or deny a motion for a new trial based on newly[ ]discovered evidence is committed to the [postconviction] court's discretion." State v. Plude , 2008 WI 58, ¶31, 310 Wis. 2d 28, 750 N.W.2d 42. We review the postconviction court's determination for an erroneous exercise of that discretion. See State v. McCallum , 208 Wis. 2d 463, 473, 561 N.W.2d 707 (1997). A postconviction court erroneously exercises its discretion when it applies the wrong legal standard or makes a decision not reasonably supported by the facts of record. See Johnson v. Cintas Corp. No. 2 , 2012 WI 31, ¶22, 339 Wis. 2d 493, 811 N.W.2d 756. Thus, we will not overturn a discretionary determination merely because we would have reached a different result. See id. Rather, "[b]ecause the exercise of discretion is so essential to the [postconviction] court's functioning, we generally look for reasons to sustain discretionary decisions." Burkes v. Hales , 165 Wis. 2d 585, 591, 478 N.W.2d 37 (Ct. App. 1991) (citation omitted; first set of brackets in Burkes ).
¶26 To obtain a new trial based on newly discovered evidence, Wilber must establish, by clear and convincing evidence, that: "(1) the evidence was discovered after conviction; (2) [he] was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." See State v. Edmunds , 2008 WI App 33, ¶13, 308 Wis. 2d 374, 746 N.W.2d 590 (citation omitted). If those four criteria have been established, we then determine "whether a reasonable probability exists that a different result would be reached in a trial." See id. (citation omitted). "The reasonable probability factor need not be established by clear and convincing evidence, as it contains its own burden of proof." Id.
¶27 In determining the reasonable probability of a different result on retrial, the circuit court may determine the credibility of the new testimony proffered by the moving party. See State v. Carnemolla , 229 Wis. 2d 648, 660-61, 600 N.W.2d 236 (Ct. App. 1999) ; see also State v. Terrance J.W. , 202 Wis. 2d 496, 501, 550 N.W.2d 445 (Ct. App. 1996). If the postconviction court finds the newly discovered evidence credible, the court determines whether a jury, after hearing all of the evidence, would have a reasonable doubt as to the defendant's guilt. Edmunds , 308 Wis. 2d 374, ¶18. In making this latter determination, the postconviction court does not weigh the evidence. Id. We review the postconviction court's credibility finding for clear error. See Terrance J.W. , 202 Wis. 2d at 501.
¶28 Both Martin and Gonzalez claimed in their affidavits that Muniz, now deceased, confessed to Diaz's murder. Martin's affidavit states that on the morning of the shooting, Muniz, Martin's best friend, banged on Martin's door in a state of paranoia and excitement. Muniz told Martin that "some shit went down" at a party "with a guy that [Muniz] had an altercation with a few weeks earlier." Muniz gave Martin a gun to "get rid of." The affidavit further states that later that day Martin heard rumblings "about someone getting killed at a house party" at the same location Diaz was found. Muniz admitted to Martin that he (Muniz) shot "a Mexican guy ... in the head and that he was paranoid because there was a lot of people in the living room when he did it."
¶29 Gonzalez's affidavit states that he was present at the party on January 31, 2004, and that he witnessed Muniz shoot Diaz. The affidavit further states that Gonzalez and Muniz had mutual friends and were familiar with each other, that Muniz was known for always being armed, and that Gonzalez told Wilber's defense counsel that he was willing to testify but did not hear from counsel.
¶30 We conclude that the affidavits fail to meet the criteria necessary to constitute newly discovered evidence.
¶31 Martin's affidavit consists entirely of hearsay. Wilber argues that the statements in the affidavit are an exception to the hearsay rule because they constitute statements against interest.
¶32 A statement against interest is
[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborated.
WIS. STAT . § 908.045(4). The statute provides that a statement against interest is not excluded by the hearsay rule if the declarant is unavailable as a witness. See id . The extent of corroboration required is "corroboration sufficient to permit a reasonable person to conclude, in light of all the facts and circumstances, that the statement could be true." State v. Guerard , 2004 WI 85, ¶23, 273 Wis. 2d 250, 682 N.W.2d 12 (citation omitted).
¶33 It is undisputed that Muniz is unavailable as a witness and that his statements would qualify as statements against his interest; however, Wilber's motion is not corroborated. The closest Wilber comes to corroborating Martin's affidavit is referring to Torres's testimony, which places Muniz at the party with a gun. Torres testified that "Ricky" (Muniz) was not near Diaz when Diaz was shot. Moreover, a different witness testified that Muniz left the party before Diaz was shot. Accordingly, Martin's affidavit would have been inadmissible hearsay at trial. Inadmissible evidence cannot provide a basis for challenging a conviction. See State v. Bembenek , 140 Wis. 2d 248, 253, 409 N.W.2d 432 (Ct. App. 1987).
¶34 As to Gonzalez's affidavit, we conclude that the evidence is not newly discovered. Gonzalez's affidavit states that he told Wilber's defense counsel about his willingness to testify about Muniz's role in the shooting. An affidavit from Wilber states that he asked defense counsel to investigate Gonzalez. Assuming Wilber's claim is true, Wilber knew that Gonzalez had potentially exculpatory information either before or during trial but did not seek it. Moreover, after the defense rested, two of Wilber's sisters testified that they knew of Gonzalez's involvement during the trial but sat on the information. The sisters also stated that Gonzalez identified "Isaiah," not Muniz, as the shooter. Gonzalez's "new" affidavit is wholly inconsistent with what he allegedly told Wilber's sister during trial.
II. Postconviction Discovery
¶35 Wilber contends that the postconviction court erroneously denied his request for crime scene photos from the State. Wilber sought to submit the photos to an expert to create a scaled diagram of the crime scene. The postconviction court denied the request, finding that "a completely accurate depiction of the crime scene would not have altered the outcome of the trial in that a reading of the trial testimony demonstrates that no other outcome would have been reasonably probable to occur." We agree.
¶36 In State v. O'Brien , 223 Wis. 2d 303, 323, 588 N.W.2d 8 (1999), our supreme court recognized that a criminal defendant has a limited right to postconviction discovery. However, to obtain postconviction discovery, the defendant must first establish that the sought-after evidence is consequential to the case. Id. Evidence is consequential when there is a reasonable probability it would have resulted in a different outcome. Id. The postconviction court has discretion to grant or deny a request for postconviction discovery. State v. Ziebart , 2003 WI App 258, ¶32, 268 Wis. 2d 468, 673 N.W.2d 369.
¶37 Wilber contends that the materials he sought do not constitute postconviction discovery because the photographs are "previously disclosed evidence." Wilber is mistaken. First, the evidence Wilber seeks indeed falls within the category of postconviction discovery. See O'Brien , 223 Wis. 2d at 319 ("The second issue that we consider is whether the defendant was entitled to, and was improperly denied, the opportunity to remove exhibits, post conviction....Our focus here is on the defendant's right to post-conviction discovery."). More importantly, however, is that regardless of how Wilber characterizes the photographs, the materials sought are not consequential to the case because there is no reasonable probability that a to-scale depiction of the crime scene would have altered the result of the trial. Multiple witnesses testified that Wilber was acting aggressively and violently just prior to the shooting. Torres testified that he saw Wilber with a gun immediately after the shooting and that the gunshot came from the direction in which Wilber was standing. Multiple witnesses testified that they heard Antonia say something to the effect of "I can't believe he shot him," in reference to Wilber. Kohl testified about the layout of the kitchen and where Diaz's body was found with respect to the dimensions of the kitchen. He also testified about what was visible in the kitchen from within the kitchen and from other parts of the house. The postconviction court did not erroneously deny Wilber's postconviction motion seeking photographs of the crime scene.
III. Ineffective Assistance of Defense and Postconviction Counsel
A. Defense Counsel
¶38 Wilber argues that his defense counsel was ineffective for failing to reasonably investigate Gonzalez's knowledge of the shooting and for failing to retain experts to support the defense's theory that "the physical evidence excluded Wilber as the shooter."
¶39 To set aside a judgment of conviction for ineffective assistance of counsel, a defendant must show both that his or her counsel's performance was deficient and that the deficient performance prejudiced his or her defense. Strickland v. Washington , 466 U.S. 668, 687 (1984). To prove that counsel's performance was deficient, a defendant must point to specific acts or omissions that were "outside the wide range of professionally competent assistance." Id. at 690. To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. Id. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. Because a defendant must show both deficient performance and prejudice, an appellate court need not consider one prong if the defendant has failed to establish the other. See State v. Chu , 2002 WI App 98, ¶47, 253 Wis. 2d 666, 643 N.W.2d 878.
¶40 We agree with the State that "Wilber's claim that [defense counsel] knew [that Gonzalez witnessed the shooting] is supported only by his own self-serving statement ... which is conclusively disproven by the record." After the defense rested at trial, defense counsel asked for an adjournment to investigate claims that Gonzalez witnessed another person shoot Diaz, telling the court that he did not know Gonzalez was a potential witness until that moment. Counsel told the court that Wilber made no mention of Gonzalez before trial. Therefore, any claim that defense counsel failed to investigate Gonzalez as a potential witness is belied by the record.
¶41 Moreover, Wilber cannot demonstrate that he was prejudiced by counsel's failure to investigate Gonzalez. Wilber ignores the fact that counsel did request an opportunity to investigate Gonzalez toward the end of the trial, but his request was rejected by the trial court because the court found Wilber's sisters' testimony about Gonzalez's involvement to be "preposterous." At that time, Gonzalez allegedly identified "Isaiah" as the shooter; however, Gonzalez's affidavit identified a now-deceased Muniz. Gonzalez's inconsistent identifications do not support a reasonable probability of a different result. Accordingly, defense counsel was not ineffective.
¶42 As to Wilber's claim that defense counsel failed to retain an expert to "explain[ ] how the physical evidence contradicts the [S]tate's speculative theory," we conclude that Wilber was not prejudiced by this "failure." To the extent Wilber complains about the lack of an expert to recreate the crime scene, we have already discussed why Wilber was not prejudiced. To the extent Wilber argues that counsel should have hired an expert to evaluate the direction from which Diaz was shot, we again conclude that Wilber was not prejudiced. As we have discussed, the evidence was sufficient to support a conviction. Wilber has not demonstrated that, but for counsel's failure to hire an expert, the result of the proceeding would have been different.
B. Postconviction Counsel
¶43 Wilber argues that postconviction counsel was ineffective for failing to challenge the sufficiency of the evidence and for failing to raise defense counsel's ineffectiveness. Because we have concluded that the evidence was sufficient and that defense counsel was not ineffective, we need not address this issue. See State v. Castillo , 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) (We decide cases on the narrowest possible grounds.).
IV. Motion for Remand
¶44 While this appeal was pending, Wilber, through new appellate counsel, asked this court to stay proceedings and remand the case to the postconviction court granting him leave to file a supplemental WIS. STAT . § 974.06 motion. Appellate counsel argued that the physical evidence did not comport with a conviction and that the trial court made several errors. We denied Wilber's motion, stating, "The question before [this] court is whether the [postconviction] court erred when it denied Wilber's motion without a hearing. We are not persuaded that further [postconviction] court proceedings are necessary to resolve that question, and the motion itself indicates that the ... [court's] purported errors could be addressed on direct appeal." Wilber now argues that we erroneously exercised our discretion in denying his request to remand this case.
¶45 Wilber's request for this court to reconsider its decision denying remand is inappropriately raised in his appellate brief. Wilber's appeal is from the postconviction court's order denying his postconviction motion without a hearing, not this court's denial of his motion for remand. We do not address this issue further.
V. New Trial in the Interest of Justice
¶46 Finally, Wilber contends that he is entitled to a new trial in the interest of justice because the real controversy-whether Wilber shot Diaz-was not tried. He also argues that justice was miscarried because "[t]he new evidence of Muniz's actual involvement in killing Diaz fits comfortably with both the eyewitness testimony and the undisputed physical evidence." We disagree.
¶47 We may order a new trial in the interest of justice "if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried[.]" See WIS. STAT . § 752.35. However, we do so only in exceptional cases. See State v. McKellips , 2016 WI 51, ¶30, 369 Wis. 2d 437, 881 N.W.2d 258. Wilber gives the reasons we have already addressed as the basis for his argument that the real controversy was not fully tried and that justice was miscarried. Because we reject his interpretation of the statute and have concluded that newly discovered evidence does not warrant a new trial and there is sufficient evidence to support his conviction, there is no injustice and extraordinary relief is not warranted in this case. Thus, we decline to exercise our discretionary powers to order a new trial in the interest of justice.
¶48 For the foregoing reasons, we affirm.
By the Court. -Order affirmed.
Not recommended for publication in the official reports.

We refer to Wilber and the victim, David Diaz, by their last names. Other parties sharing last names are referred to by their first names.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The Honorable Jeffrey A. Wagner denied Wilber's motion seeking pictures of the crime scene.

Wilber raised several arguments in his appellate brief which we have consolidated. To the extent Wilber raised arguments not addressed in this opinion, we conclude that this opinion is dispositive.